Next case on the docket is 519-0128, Woodsides v. Rodely Let's see, it looks like we have, um, the Appleys are going to divide big time, is that true? Yes, ma'am. Regions Bank, and then Mr. Campanella? Yes, ma'am. Okay. Um, I only want to caution you that if the bank runs over, you have to be careful. How are you going to handle that? Are you going to give me about five minutes? Um, we can't do that. You'll have to keep your own job if you run over. Mr. Campanella is assured that we won't go past this time. Well, if you're going first, who's going first? Oh, okay, okay. I was only worried about the five minutes, because if you go past the five minutes, okay, you've worked it out. We turn now to Mr. Roth. Good afternoon, Your Honor, counsel. May it please the Court, and counsel. My name is Timothy Roth. I'm an attorney with Bartow & Hungerford in Nashville, Illinois. I represent the appellants, Chanson v. Woodsides, who are here today. And we're asking the Court to apply an ordinary law to the facts and circumstances of this case and determine if the plaintiffs are the owners of the subject real estate according to their deed and to reinstate their slander of title action against the defense. Um, the last attorney apologized, and I've got to apologize twice over. Um, as I prepared for this case, I can't understand how I did so many things wrong and got such a negative outcome in the circuit court. And as I struggled with that, I think there really is a reason for that, because there's sort of a mystery over this case, a fog, a smoke screen that was established. It's a family dispute. The appellants, Denise Woodside and Gene, Jr., Rodley, the defendant, are first cousins. So it's a family dispute. And with that comes this whole idea that there is something where the family really knew what was going on. Um, and they didn't. This wasn't the Hatfields and McCoys. Sure enough, the farmhouse burned down later on. Nobody was living there. Maybe mysterious circumstances, but it had nothing to do with a family dispute. This wasn't, you know, the epic battle where every Christmas party, every funeral, every family event or wedding, that this thing came up and the family fought about it. What it really is is a disgruntled heir. His father had placed 40-acre, their grandparents' home place, into his trust. And it appears that he had placed the whole 40 acres into the trust. And he had left the full 40 acres, it appeared, to his son, the defendant. That wasn't the case. Aunt Freda owned a quarter interest in the property. Okay, so it's not really a family dispute. This is something that only came up twice. In the testimony, it came up twice. Once, David Broderick, the defendant's brother, who was the successor trustee, told Aunt Freda at a funeral, at the visitation, she said, I'm the trustee now, you can't deal with my dad anymore. That happened either after the first deed or perhaps right before the first deed, but certainly before the second deed. Okay, and what Aunt Freda and Uncle Gene or Gene Sr. were doing was partitioning the property in these two deeds. And it was this notice that the successor trustee gave her at that funeral. I mean, that didn't turn into a family dispute. It put her on notice. So what would she do? She'd go and find out who the trustee is. And she had two ways of doing it. The first way is to go and see who owns the legal title to the property in the land. And sure enough, the Deed and Trust said to Gene Sr. as trustee of his trust. And she knew this right away because if it was before or after the first deed, before the first trustee's deed, there was a deed as an individual. And she had already gotten a new deed as trustee from her brother. And so she knew that he was, according to the land records, the trustee of the trust. And so then the other thing she could do, which she did for the second deed, was go ask her brother. Who's the trustee? It's your trust. It's a revocable trust. You have the power to remove the trustee, appoint a trustee. Who is the trustee? He signed the deed and said he was the trustee. He's the trustee. So he said he's the trustee. The land records of Perry County say he's the trustee. There is no controversy. So there's no family disputes. The second time this comes up is after Gene Sr. has passed away. And then the defendant, Gene Jr., sends a letter to Aunt Freda and says, you have to return the property. You've got these two deeds from my dad. They're not valid. And his attorney says they're not valid first because Gene Sr. signed an Illinois statutory short-form power of attorney for property. And once he signed that, any conveyance he attempted to make was invalid because he had signed a power of attorney. Mind-boggling. You know, not a real legal fear. The other thing that the attorney said was we got an opinion from a doctor that he really couldn't handle his affairs. And that's in the record. The opinion says I think it would be a benefit if his son took over as trustee. He's old. He's had Parkinson's for a long time. His eyesight is failing. All sorts of health issues. It would be a benefit if his son took over. In the trust for removal, it says you need the opinion of two doctors saying that he's incompetent, that he can't handle his affairs. But the attorney says, you know, one opinion that he could benefit from having his son take over is the same as two doctors saying that he can't handle it. So here we've got this family dispute, right? We think a family dispute, that everybody knew about it. But we've got these ridiculous legal theories and a conversation at a funeral. But David had been appointed trustee. Pardon? David had been appointed trustee, right? It's debatable. It's seriously debatable. I mean, because he wasn't appointed trustee according to the terms of the trust and the way it was supposed to be done according to the trust. There was a document produced much later on. But at that time, 2003, they didn't say, and by the way, Gene resigned as trustee. They said, no, it's out of power of attorney. And so he couldn't possibly have executed a deed after that. His property was in Nashville, Illinois? No, the property, the property itself is north of Des Moines. Yeah. Yeah, Perry County. This came out of Perry County. The client's living there. I work in Nashville, Illinois. I live in Oklahoma. But I work there. I heard Nashville first call it. No, no, this is Des Moines. Just make sure we're in the right property. Right. So we've got this family dispute, which creates this whole impression that everybody knew what was going on and that there was a real dispute. And this comes to play for notice, which I'll get to in a minute. But that's not the extent of this fog and this mystique about the case that something was going on. The next thing is, you know, there's this idea that Ann Friedan did something wrong. And it really comes from the fact that she was partitioning this property with her brother. She had a one-quarter interest, and she ends up with more than 10 acres out of the 40 acres. And the reason for that that came out at trial was because in the first 10 acres that she was given, she was supposed to get the house. And she didn't get the house. And so when everybody figured out that she didn't have the house, she went back to her brother and said, I was supposed to get the house. So he gave her the house, which was the second tract that was conveyed some six or eight months later that included the house. And the house, you know, you can say on a partition, how often when you've got a house that is of no value, an old farmhouse that has all the taxes on it, and you've got an old shed, which does have some economic value, and then you've got ground. Why should that be divided up 10 acres and 30 acres if it's a one-quarter interest? You've got these other assets that have to be dealt with. In this case, the house was a money pit. You know, all the taxes were on the house. As soon as the house was transferred to Ann Frieda, the tax bill went down 75%. You know, she took on all the taxes. She had the utilities. She had the house, which, you know, had some sentimental value to her, perhaps or not. We don't know. We don't know how this partition went down. What we do know is that we had these two joint owners who were dividing up the property. And now we're going to try and second-guess that because the defendants have just grumbled there. But the impression that that creates of her getting more than the 10 acres that she was due is that she cheated her brother. And so there's this mystery that she cheated her brother. She went into the nursing home, put the pen in his hand, and had him sign a deed that he didn't know what he was signing. And, of course, then with that comes he was in the nursing home, so he must have been incompetent. Excuse me. The parcel one was 10 acres. It was 10 acres. And then the house was parcel two. Right. And how much? Five acres. It was divided off. They measured over how far they'd have to get to get the house. So the first part was the southwest quarter, the southwest quarter, the southwest quarter. The next part was the southeast quarter of the southwest quarter, southwest quarter, except the east 300 feet, which would have been the part that they didn't need to encompass the house. Okay. All right. Thank you. So it was just the house was the second tract, and the idea was that everybody knew they were free. We went back to their grandparents' will or grandma's will, which was never probated, which was introduced by the defendants as an exhibit in this case. The four siblings got the real estate, but it came with a burden. And under mom's will, Aunt Freda got all the personal property, except the gifts that had been given by individuals. So she was treated differently in the will in terms of getting the personal property. And the land was supposed to come with the burden of not being able to sell it to anybody but one of the siblings. So in partitioning this, they gave up something else as well, which was the opportunity to probate mom's will and say, you can't sell the property to anybody but me. So they settled that right there. And so you've got this idea, this impression, that what Freda did was go into the nursing home and cheat her brother. There's absolutely no evidence on that. The judge found that, sure enough, Gene was incompetent. But the testimony of both the witnesses for the defendants, who were asked point blank, was your father incompetent, was no. I couldn't say that my father was incompetent. So the impression that she went in and manipulated, keep in mind, she was 75 years old at that time. She's still alive. She's 95, 98, something like that. But this is 2001. She went into the nursing home as a little old lady and cheated her brother out of it. She didn't stand in any sort of fiduciary capacity where you could say, sure enough, we've got a presumption that she went in and cheated him. I mean, sure enough, that was Gene Senior's little sister. And I know if my little sister came in and told me to do something, I'd probably do it. But I mean, that's not a fiduciary relationship. I can just tell by your face. Maybe not. You're right. But before she was 30 years old, she had me twisted around much better than she does now. But the point was that these things create the impression, first off, that there's notice out there that everybody knew about this conflict, and then that there was fraud, that Aunt Freda did something wrong. And so that comes into play with denying all the legal theories that we put out there. The back door to denying them is, well, it's true except that there's fraud, and there must have been fraud in this case. The court says it's just as likely that there was fraud in this case. But isn't part of the pivotal issue here the fact that the court found that there was some overreach? I don't know. And you say she went into the nursing home. We don't know that she went into the nursing home. I should say that, too. There was no testimony as to where the deeds were signed or how they were signed or under what circumstance. But didn't the court make a finding in that regard? I think the court made the observation that he was in the nursing home. But one of the issues that we've got is that the court had admitted in an early hearing that this was a good friend of the judge's. And so he knew that the guy was in the nursing home, but that wasn't the testimony that this man was in a nursing home when Freda went in and took advantage on his deathbed or something. I understand your argument, but when we review this case and look at the court's findings, we have an abuse of discretion standard on that? And let me say that the... Do you agree with that? For the findings except for the findings of law. And that's what I'm going to focus on entirely here. So let me get away from this smoke screen. I've only got one last thing that I want to point out on the smoke screen is that there's this impression in this case that the defendant has some reasonable, equitable position. And he doesn't. That letter went back and forth with David Rorley, the defendant's brother, the defendant, the defendant's attorney, and the attorney that prepared this deed that was the first slander on my client's title, on Anne Freda's title at that time. They knew full well that Anne Freda had these two deeds out there. And what did they do? They prepared a deed from David's successive trustee to his brother for all 40 acres. They knew that that deed was inconsistent with the land records of Perry County and not supported by any legal theory. Now, they both say that at the time their father passed away, they thought he owned the full 40 acres and that Freda had really gone into the nursing home and cheated him out of his property, not partitioned the property, but taken a share that didn't belong to her. They only found that out later. But what they did was they took the law into their own hands and they put this deed into the public record in 2004 from David Rorley, his successive trustee, a warranty deed. And what kind of trustee gives a warranty deed? But he gave a warranty deed to his brother saying that you get the full 40 acres. Okay, so that's the cloud is that these guys took it upon themselves to fix this problem. The threat of going to court if you don't give us the property back in two weeks, that was the letter in 2003, we're going to go to court. They never went to court. He said there was pressure from the family to avoid going to court. I'll skip over the fact that the first defendant's counterclaim asked for Freda's deed to Gene to be upheld and the deed from Gene to Freda to be overturned so that Freda ended up with only one-sixteenth of the property instead of one-fourth of the property. We'll ignore that because he's taken, walked back on that at least early at the hearings and all the rest of that. So let's get to the real meat of this, okay? And this is where, what does Illinois law say about this language that's the full power language in a trustee's deed? What it says is that this is not against public policy to say that you can set the standards for how a trustee deals with a third party. And the standard in this case was that if the said trustee signs a deed for said real estate, then whoever's claiming under that deed has conclusive evidence that this trustee is acting pursuant to the document, that he had the authority, that he was the trustee. That's what we're asking you to find is that the words in this document mean what they say. Conclusive evidence that he was the trustee. Now, you can picture a circumstance where those words wouldn't be true. But that would require this claim of fraud, this smokescreen that's going on around this case. Well, you can't say that it's conclusive evidence because Freda went in there and picked up the pen and signed Gene's name on the deed and got the notary to be complicit. But there's no evidence of that. There's no evidence that any of that took place. What there is is a document that says any deed that Gene signs will be conclusive evidence that he was a trustee. And there are cases that come to this point. I refer you to the Burka v. Edna case out of the D.C. Circuit, which, you know, obviously is binding, but the discussion of this very language there was about, and this was a Baptist trustee, And the trustee exceeds his authority by not having actual direction from the trust beneficiaries to execute certain documents after the initial document. And the court said it doesn't matter. It doesn't matter whether the mortgager knew that they didn't have the authority. He got a deed from the trustee. And that deed is conclusive evidence. And the reason it has to be conclusive evidence is because how would any of us deal with property that never had a trust document in its chain of title otherwise? You could have something like this. Fifteen years later, the beneficiaries come back and say, hold on. That trustee wasn't the trustee. He wasn't acting with authority. The only way to do that is to put this language, this full-power language, into the deed so you don't have to find the trust document. You've just got this language, which is enough under Wing Two. It's enough to say that we have conclusive evidence, and under the law, by the way, there's no doubt that Gene was, for this purpose, the trustee. The other thing that he was was a holder of legal title. They never conveyed the land to a successor trustee, which would have cut off his right to convey the property. But under this document, he still had the right to convey the property. Whether he resigned or not, a third party, even with knowledge, can rely on that conclusive evidence, short of fraud. But in this case, there's this cloud of fraud hanging over the whole thing because Frieda went in the nursing home and stole the property from Gene. So that was our first legal theory is why shouldn't it be just that easy? The deed says conclusive evidence. We've got conclusive evidence. It should go beyond that, though. This was a self-settled trust, right? It was a declaration of trust. He put his own property into his own trust, fully revocable, with himself as trustee. He was the only beneficiary. He had all the rights. I mean, sure enough, legal title was separated into the trustee, and he conveyed the property to himself as trustee. But he had everything in this. He had the ability under the trust to control the property. It said he could convey the property in and out of the trust, probably not meaning real estate, but meaning property, in and out of the trust. It will. He could do whatever he wanted as the settler of the trust, not as the trustee, not as the beneficiary, but as the settler of the trust. You deserve these rights. So when you look at the document itself, there are actual authority in that document that allows this to be a legitimate approach. The other thing that was in there is the idea that when you've got a revocable trust, you can make whatever you want to happen happen, right, as a beneficiary, as a trustee. So, counsel, if there was a successor trustee, in effect, that that was David, is it your argument that Gene Sr. still had the right as settler to convey that property? It said so in the trust, yes. And also, if David was going to take over as trustee and didn't want his father to convey the property, he should have had his father convey the property to him in the land records of Perry County to cut off this conclusive evidence that would arise from Gene Sr. conveying the property. There are ways to stop this. He just didn't do it correctly. You raised the question about the resignation. I want to get to that very quickly because I'm out of time. That resignation doesn't even say which trust he resigned as trustee of. It doesn't. It was signed by one person, dated by another person, not witnessed by anybody. It was done purely according to the defense's witness to get the investment company to allow him to manage his father's investment account as the trustee of the trust. It was not, you know, he didn't do what he needed to to control the property. This was really the first part of the case, which we'd asked to bring up to the appellate court quite a while ago. But then we went through a trial, and then we got to the adverse possession part of this case. And this is a very straightforward one. Again, what the judge found was that there was this bad faith involved in taking the deed. And there was no bad faith in the deed. The bad faith under that secondary statute of limitations, I will answer. You can finish that sentence, Mr. Rock. The bad faith that's required under that section of the statute has been defined as far back as the 1800s as no faith in the deed that conveys the property. It's not this aura of bad faith.  So you can't get a deed that you don't think is good and then make it good with a seven-year statute of limitations. It has to be a good deed. We acknowledge that this was a good deed. The defendant acknowledged that that was a good deed in that letter that his attorney sent saying, give us back the property. They knew it was here. That, I'll stop you there. You'll get a chance to come back at us. Thank you, Mary. I think you hold the record for not being interrupted by us. Anyway, Mr. Campanella. May it please the court. My name is Jordan Campanella. Counsel. I guess I'll touch on some of the things that Tim talked about first. Mr. Raw. I'm Mr. Raw. I apologize. If this isn't a family dispute, I don't know what one is. The lower court heard the testimony from my client, which would have been referred to as Junior to keep him straight. His brother, David, the plaintiffs, we never heard from Freda, but we heard testimony of a funeral and families talking amongst themselves and who knew what. So this definitely was a family dispute. Mr. Raw spoke of Senior telling Freda this or telling he's the trustee. That's inaccurate. Freda never testified in this. Her hearsay, anything of that was kept out. Freda was never heard from in this case, along with obviously Senior because he was deceased. All we know of is what the timing of the events were with the deeds. We've got David who testified, the court found was credible. June of 2001, Senior resigned as trustee. At that time, he's in the nursing home. He's going blind and deaf. He appoints a son who is the successor, David. While admittedly the family doesn't understand completely about the trust, especially interest that was owned by Senior, they still understood that Senior owned part of that 40, even if they thought that's all. In reality, he's right. It was three quarters of an interest. So at that time, Junior is the trustee. Not Junior, I apologize. David, his brother, is the trustee. That happens in June. Then in September, testimony showed that Freda's attorney prepared deeds and they go to the nursing home because that's where Senior is to have him executed as an individual. A month later, somehow it's found out that's not going to work. He doesn't know that it's an individual. Her attorney prepares another deed in October, goes back to the nursing home. He executes it as trustee, now behind his neck. That happened in October. Then we've got June of 2002, which would be roughly eight months later. She goes back again after having her attorney prepare another deed to the nursing home and has the second deed executed, which could make the other five acres. It gets to roughly the 15 acres that were executed here. Testimony was given to the lower court, which was found credible that Freda knew about this definitely by that second deed for the extra five acres, likely at the first deed because David himself spoke to Freda, telling her, hey, you can't do this. My dad's in a nursing home. He's going to lie to death. He's resigned. I'm the trustee. The trust owns the property. I have to handle it. You have to go through me. That was found in the court that Freda was aware of that. It was also found at the lower court through testimony that the subsequent perpetrators, which would have been Bruce and Brian Broakley, also in the family, knew of this. At the time that it was conveyed to them, they knew about this incident. They knew the fact of the trust and the complications with it. What about this argument that, well, maybe that doesn't matter because Senior was the settler, and according to the documents, the terms of the document, he could convey the property even if he had resigned as trustee? Your Honor, hopefully my brief shows if we take that, I look at it as you can't have your cake and eat it, too. If you're setting up a trust, you get benefits from that trust. You have to live and die by the trust. You can't just do what you want. You can get tax consequences that help the state plan, et cetera. So if you're going to put it into the trust as a settler, and you're going to gain the benefit of trust assets and how trust laws handle assets in the state, you've got to abide by it. A settler, I never and could not find a case that says once a settler puts property into a trust, that he can go around and handle it on his own individual capacity and disregard the terms of the trust, which specifically state this is how you have to handle it. If you're going to get the benefit, you also have to have the detriment of, which is sometimes a pain in the neck, doing it a certain way and handling assets a certain way out of the trust because a settler doesn't own them anymore. That's the whole purpose of a trust. Yes, and I think this wars. Can you have a dual ownership as a settler and a trust, as a settler and a beneficiary? I don't believe so. Because I think this is spoken to in the Allward case, which was great for me. It happened just a couple months ago, but I think it speaks directly on this. It's very similar. Is that case briefed in your brief? No. It came out a month after my brief. Okay. Let's make a record on this then because we had this arise this morning. What's the case you're referring to? Allward v. Jacob Holding. Actually, Justice, you were one of the three. I'm familiar with it. 2019 IL-5180332, number 5-18-0332. Okay. Mr. Roth? Yes. Are you familiar with this case? I am familiar with the case. I believe it's supposed to have already been done. Okay. So here's my question. Are you okay today with him arguing that and us giving you an opportunity to respond in writing, or do you want him to make his argument in writing and then you respond in writing? We're going to give you the choice. I would love an argument in writing if that's acceptable to the Court, but if it would delay the process on behalf of the Court. No, no. It won't. My only question is, do you want him to argue today that case, or do you want him to put it in writing? Do you understand what I'm saying? Yes. In other words, I'm not going to let him argue that because it wasn't in the brief if you are not wanting him to. I'm going to give you the choice. I'd be happy to let him argue that case, and I will respond. I'm familiar with the case, and I'm going to handle it today. Okay. So we're going to end on a note. Mr. Campanella, we're going to end on a note. And we'll give you a few extra minutes as we go along with this. But we're going to let you argue that case, but then an ordinal issue that Mr. Roth will have 14 minutes to file a response or a supplemental brief directed only to that case. Go ahead. Okay. If you so choose. You don't have to. If you so choose, you'll have 14 days to respond to any argument you make today. I'll be happy to do that. Thank you. Okay. Do you want to give the case citation? Yes, Judge. Slowly for the court. 2019, ILAP 5th, number 5-18-0332. Sorry, 0332. That's our internal court number. 5-18 number is the internal number. Would you add back a couple of minutes for Mr. Campanella in light of my interruption? Okay. Let's hear about this case, if you will. Thank you, Your Honor. I think it supports your position. In Oliver, this court was dealt with an issue where a beneficiary, sole beneficiary, which I think is similar to my case. Because when Gene Sr. was alive, he was the sole beneficiary of his trust. The sole beneficiary goes out and forgets that this real estate is held in the trust. Leads it to, I think, his son. Lo and behold, his son later gets a loan from a bank, and the bank moves to foreclose on him. And in that case, they find out, well, it's actually held in the trust. And the original grantee, the beneficiary, says, yeah, I forgot completely that it's on me. I intended to convey it, et cetera. There's no bad faith there. But it was, I can't do it because the trust owns it. And this court, after looking at that, said, yeah, you're right. If it's in the trust, you have to, or as the court stated, only a trustee may deal with or convey the title. And in that case, there was specific language that said, beneficiary, you can force the trustee to sell land that you're going to be the beneficiary of. That still didn't save him. There was language spelling it out, and it's still this court rule that if it's in the trust, you've got to adhere by the trust, and the trustee has to convey it. So, I'm sorry, bank, but your deed's no good. It spoke to the principles that I think keep from, Justice, your point coming up, that a settler can't just do what he wants, that a conventional trust, the trustee holds the legal title, the only trustee can handle it. The policy of our courts is to demand that persons dealing with trust property strictly observe to the trustee the features. That was in the Kontenhof case that was cited. It specifically says that the Crooks case says that beneficiaries cannot convey on their own, that the trustee has to. The Crooks case points out, if you want the advantages of a trust, you must adhere to the trust. You can't act as if no trust exists. And in that case, even though there was no notice on behalf of the multiple grantees, the court said, actually, you have constructive notice. That also is a problem. You have constructive notice that this deed was recorded. You can have knowledge that way. Here, in our case, not only was there constructive notice, but you've got the family problem. You've got the fact that family members talk to each other. You've got David testifying to the fact that he personally spoke. He conveyed this knowledge. So as much as Mr. Rall wants to put forth that there was no bad faith, the lower court listened to the evidence and found that there was a lack of good faith because of the events that happened here, the long period of time that we're talking about, but that occurred. I think that that Allwood case is even a harder call than this one is because there was no knowledge that was passed like it was proven here regarding the problem with the 01 and 02 deeds that happened in this case. Thank you. What about the claim that the trust document was not followed by the court when it said it required two positions to declare the competency of senior for any competency of senior? Your Honor, I think that's irrelevant. I don't think it matters. Why? Because here, the fact that he resigned as the trustee is what took away the power. That resignation of trustee took him from the ability to transfer the property. So the incompetency was before his resignation or after. Timelines are tough to follow. Exactly. And I don't know if there's a clear-cut answer on when his incompetency occurred. He was legally incompetent as of June 2001, whenever he resigned as trustee. That was going to be my next question. Can an incompetent person legally resign? That's a good question. I don't think the court found that that resignation under the circumstances that he was legally or, yes, mentally incompetent at the time that he resigned. So the resignation is the key point for you as opposed to the fact that he was determined to be incompetent. You think that's kind of the red herring? Correct, Judge. I think that's the biggest deal here is that his legal capacity was not there because of the resignation. I think, yeah, it's a— His legal capacity to transfer title, not mental capacity. Correct. I apologize. I just want to clarify. No, I get that. I apologize because legal capacity can get confused in different areas, too. Yes, legal capacity as opposed to transferring property out of the trust. But, yes, you're right. His mental capacity was an issue, and I think that's what speaks to the lack of good faith in what the court found after hearing from testimony from David and the people that we had. So, yes, that is a cloud over it that is on top of the legal argument that we have here of the trust not being followed and not being able to do what Mr. Raul would like the court to accept. Are you still going to share time with the bank? Yes. Okay. Okay. Mr. Raul spoke of whether—it's out in the open whether David was definitely the trustee. I think the court—it was conclusively found that there was a resignation by the testimony that was given at the trial court. I don't think an abuse of discretion can be meant to say that he was incredible. At this time, I think the resignation did occur, and the testimony around it proves that June 2001 is what we're talking about. A lot of what Mr. Raul spoke of is what Frida said. That was never allowed. Frida wasn't part of it. She probably should have, and I think the court alludes to it, is that he had to make the decision based on what was in front of him. The testimony from family members in front of him. Frida was not there. There was no evidence from Frida, and we can't conjecture at this point what Frida did, what she was trying to do. We can just take what other people talked about and base our decision on that. So the court found that it didn't know who prepared the deeds. The court said that because of what you said, Frida was not around and David Sr. was not around. At least Frida didn't testify, I should say. The court found that exactly what happened between Sr. and Frida between June 2001 and June 2002 is unknown and unproven. That was a finding in its own right. Yes, it found the exact circumstances, but the deeds were prepared by her attorney, Mark Macklin. If the court ruled that, I'd have to go back to the testimony, but Mark Macklin prepared those deeds, and I believe Jerry Smith, which created the conflict. No, Mark Macklin. Yes, Mark Macklin was Frida's. Well, that's interesting because it appears in reading the order that the court didn't know, but that's okay. You clarified that for me. That's good. Yes, Mark Macklin was Frida's attorney. There's really no dispute on that, then, as to who prepared the deeds? Okay. Go ahead, Mr. Campbell. Okay. Judge, I think I'll just finish. I think I'm getting close to my time. You don't have to use all your time. Yeah, I'm finishing. I appreciate it. With the length of this case, I feel like I could talk about it for days today. You can probably see from the record. It's okay. Mr. Brau is ready to jump off and go after us. I'll give my— That's okay. But you can defer to the bank. It's all right. I'll give my co-counsel more time. Not co-counsel, but the reason is more time. But I feel Allward is very specific and talks to it, even though it's not the exact—the overarching principles say why this can't happen the way Mr. All wants it to. If you're going to have trust, you've got to abide by it because you're getting the benefit for it. You can't do whatever you want outside of it. You have to do what the terms say. It's like a contract. You set it up. Thank you. I appreciate your time. Okay. Thank you, Mr. Campbell. Is Mr. Howard? For you. For you. Okay. I'm familiar. It's the only way I know how to make that work. I'm sorry? May it please the Court. Counsel. My son is a senior in high school and applying for colleges, and he has lots of options. So I'm going to give you options in this case so you don't have to decide the third appellate issue, which is involving Regents Bank if you don't want to. It's simply uphold what the circuit court did and find that the appellants have no interest in the dispute of property. If that's the case, there's not a slander of type case. For not being a family dispute, a lot of time was spent talking about the non-family dispute. My issue is very simple. With regard to the slander of title claim against Regents, which is the only outstanding claim, when did the statute of limitations commence? Parties agree it's a five-year statute of limitations. The Court specifically found that when the appellants discovered this mortgage in 2016 through a title search, while trying to get a mortgage for the property to build something on the property, is when it was discovered by them. And that's when they claimed the statute should run. Excuse me. Discovery rule is not immutable. It's not necessarily applied. We use lots of devices to figure out when the appellants might have had notice or should have had notice or likely would have had notice or when they might have evaded finding out the true character of the property. One of those is constructive or inquiry notice. And so constructive notice is knowledge which is imputed to them at the time of the conveyance, which they don't seem to argue about that 2010, when Regents mortgage was filed, is the appropriate date for when the statute should have started, absent the discovery rule applying. Constructive notice is found where, under Illinois law, under numerous cases, properly recorded land title records in which the real estate is located. That happened here. It was perfectly valid recording in Perry County. On what date? In 2010. And I'm not going to bother with months because we're either off years or in years. So inquiry notice is when a person has knowledge or facts of the circumstances that would cause a person of prudence to make further inquiry. In the failure to make that further inquiry, they are charged with the notice of the facts which would have been discovered. This was a long going family dispute. By 2010, it had been going on for nearly a decade. The appellant's brother and brother-in-law are the ones who gave them a warranty deed to the property. A warranty deed. They sued the brother and brother-in-law for debt, for giving them an incumbent piece of property. No. We know about the swaddling that was going on. These two have been talking about it for 45 minutes. We had a trial over it. But even at the time that the motion was granted, there was page after page after page in the Second Amendment petition, which talked about all the conveyances or would-be conveyances, about all the defects or mental defects or presumed mental defects or non-mental defects that might have affected people. That was all in the Second Amendment petition for which the circuit court ruled on. It was all clear that they should have been on notice that there was a problem going on with this piece of property. They didn't do anything about it. They didn't get a title report until three years after they owned the property. They had a warranty deed that was given to them. They didn't pursue that out. Instead, we'll go to the one person who doesn't know anything about the property but who has money, which is Regent's Bank, and we'll sue them. A couple of years, by the way, after we found out that they filed a mortgage. And several years after this case was going, and way after we got the property, and six years after the mortgage was actually filed, they were on notice. They had their peril. Thank you. Mr. Rohn, do you have anything you want to say? No. Just a couple of things. You're absolutely right. In the line of respect to Mr. Campanella, the smoke screen continues. We don't know what the circumstances were of the execution of those deeds. What we do know is that you live and die by the trust, and it's the terms of the trust. And part of the trust is the full power deed into trust. The terms of that document become part of the trust. In the Wynkoop case, which is referenced from the early 20th century, the idea was all they had was the deed into trust, and from that they had to find the rest of the trust agreement. Here we've got this full power deed into trust, and so I invite the defendant to live and die by this as well. If Gene Sr. signs a deed, that is conclusive evidence that he had the authority to transfer the property. The authority, if I could go back and address that authority within there, I wasn't saying that he had the authority as settler to sign a deed like in the case, the Allwood case, because I think that supports us. In this case, when you look at the words of the documents that are out there in the record, they say that his signature as trustee has to be relied on. It's conclusive evidence. The authority I was looking to in the trust was one where he could convey the property, not like a land trust where there's a direction, it just says he can convey the property, but also in there is the authority to fire a trustee and appoint a trustee. So if he says he wants to be the trustee and we say we don't know what Gene said to Frieda, we know he signed a deed saying he was the trustee and a notary said that's his signature and he executed this document as trustee of that trust. But they say he had already resigned. But it doesn't matter. He could walk in that morning because he didn't resign according to the terms of the trust. The trust said if you're going to resign, you have to sign a resignation, refer to the trust by the date of the instrument, not just some revocable trust of Gene Sr., and then you have to have the successor trustee accept the office and you have to put that document with the paperwork and that successor trustee has to sign the trust document. That's what the trust document says. Live and die by that. Those are the terms. Do what it says or don't cling to the fact that he resigned because it's convenient. Because now, 15 years later, we can undo this partition of these two competent adults. He was never incompetent. Nobody testified that he was incompetent. The judge found that. But nobody testified today. There was no evidence. Let me ask you because this whole concept of him signing as trustee. Yes. This is what I was asking Mr. Campanella about. There's a section of the court's order called the parent authority, which is what you're really arguing is that she had a right to rely on the signature trustee. That was one of the arguments that I presented because that's, yes. But the court seems bewildered almost by that because the court says, and I'll read it again, exactly what happened between Sr. and Frida between June 2001 and June 2002 is unknown and unproven. It sounds to me like you're arguing there was plenty of evidence. No. I'm arguing that there's absolutely no evidence as to what happened. What we've got are the documents that they executed, and those have to be taken at their face value. The court goes on to say that there was no evidence and it was plain as fur to satisfy this group. They have failed to prove that Aunt Frida's reliance was reasonable. So how do you prove what you're saying? That Aunt Frida started paying, you know, the property taxes were, say, $400. But Frida did not testify. And she started paying the taxes. She didn't testify, and yet you want us to accept the fact that she reasonably relied upon that signature. No. What I want you to accept is that my clients can reasonably rely on that signature, not 20 years later. That's what that argument was going to about the parent authority. It appears that he signed as trustee. If that guy had signed as trustee, there wouldn't have been a case. In this case, he signed as trustee, conclusive evidence that he was a trustee, and now 20 years later, why can't we rely on him? That's where we are on that argument. But we had other arguments, right? And it's this cloud of everybody knew everything that was going on, but there wasn't even a real claim against it because they didn't bring up this thing about the trustee until this case. In 2003, they said he signed a power of attorney. A power of attorney doesn't give up anything. And I know my argument around agency and all the rest of that doesn't apply because a trustee isn't an agent. A trustee is something different. He's got independent authority and all the rest of that, but it's this idea that you can't pretend to be the trustee because really what the defendant is asking the court to do in this case is say their dad committed fraud. That's what they're asking you to find is that their dad committed fraud on freedom. And I apologize for not talking faster. We're not talking faster? I think you definitely hold the record today. I can tell you that. Thank you, Judge, for just asking the court to follow up on the argument. And thank you to the court. Yes. Okay. Thank you, gentlemen, for your vivacious arguments. And welcome to our court. I'm sorry it's under these circumstances. But you are in a courthouse that Abraham Lincoln stood and argued a tennis case in on behalf of the Illinois Central Railroad. We invite the members of our community and our district to come and visit us, not necessarily under these circumstances. But thank you all. Thank you. The order from this court will issue in due course. Thank you. It will be taken under advisement.